**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Criminal No. 10-201 |
| **THOMAS CLAY WADE**, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Pending before the court are a supplemental motion to suppress evidence (ECF No. 94), a motion for discovery with respect to the telephone number used by the confidential informant ("CI") in the present case (ECF No. 95), and a renewed motion for a hearing[1] pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), filed by Defendant Thomas Clay Wade ("defendant" or "Wade") in the above-captioned case. On October 12, 2010, a federal grand jury in the Western District of Pennsylvania returned a two-count indictment charging defendant with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and with possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii). (ECF No. 1.)

On June 28, 2011, defendant submitted an omnibus pretrial filing. (ECF No. 37.) That filing contained: (a) a motion to suppress the drugs and shotgun which were found in the search of Wade's residence; (b) a motion to suppress several confessions made by Wade; (c) a motion for early disclosure of Jencks materials; (d) a motion for early disclosure of <u>Brady</u> materials; (e)

---

[1] This motion was raised orally at the hearing on January 18, 2013, but was never memorialized in writing. To the extent the court permitted further testimony and argument with respect to the <u>Franks</u> hearing issue, it will be addressed herein.

a motion for disclosure and exclusion of any evidence of defendant's prior bad acts; (f) a motion for a court order requiring law enforcement agents to retain all rough notes and writings relating to Wade's case; (g) a motion to reveal the identity of the CI who assisted in Wade's investigation;  and (h) a motion for leave to file a supplement to defendant's pretrial motions. (Id.)  Defendant concurrently filed a brief in support of those motions.  (ECF No. 38.)

On September 19, 2011, Wade filed a supplemental pretrial motion requesting disclosure of the identity of the CI used to arrange the controlled buy which ultimately resulted in his arrest. (ECF No. 48.)  The supplemental motion requested the CI's telephone number as a purported alternative to disclosing his identity.  (Id.)  On September 19, 2011, the government filed responses to defendant's pretrial motions.  (ECF Nos. 47 & 50.)

On September 20, 2011, the court held a hearing on Wade's pretrial motions.  The court denied without prejudice as moot defendant's motion for early disclosure of Jencks material. The court denied without prejudice as moot defendant's motion for early disclosure of Brady material.  The court granted in part and denied in part Wade's motion to disclose and exclude uncharged misconduct evidence.  The court granted defendant's motion for an order to preserve and retain rough notes and writings.  The court denied without prejudice defendant's motion to suppress the drugs and shotgun found during the search of his home, denying defendant's request for a Franks hearing.  The court denied without prejudice defendant's motion to reveal the identity of the government's CI.  The court granted the motion for leave to supplement and amend his pretrial motions.  The court denied defendant's supplemental motion to reveal the CI's identity or telephone number (ECF No. 48).  The court took the parties' arguments under advisement with respect to defendant's motion to suppress his confessions and the fruits thereof, which was the only matter not resolved on the record at the hearing.  The court continued the

hearing to November 22, 2011. On November 4, 2011, Wade filed a supplemental motion for a Franks hearing.  (ECF No. 57.)

At the continued hearing held on November 22, 2011, the court heard arguments and testimony regarding (a) the motion to suppress Wade's confessions and the fruits thereof, the only issue remaining from Wade's omnibus pretrial filing (ECF No. 37),  and (b) the motion for a Franks hearing. (ECF No. 57.)  The court set an additional hearing on the motions, which was ultimately held on January 9, 2012.  At the conclusion of the January 9, 2012 hearing, the court ordered the parties to file proposed findings of fact and conclusions of law on the two remaining matters.  The parties submitted their proposed findings and conclusions on February 24, 2012. On March 26, 2012, the court issued its memorandum opinion and order, in which it denied defendant's motions to suppress and for a Franks hearing. (ECF No. 75.)

Following appointment of new counsel, defendant filed the present motions on September 20, 2012, renewing his motion to suppress evidence and statements obtained as a result of an allegedly illegal search and seizure, and his motion for discovery.[2] The court held a fourth evidentiary hearing on January 18, 2013, at which time the court heard testimony with respect to the CI's telephone number and further argument. The court ordered the parties to file proposed findings of fact and conclusions of law with respect to the motion for a Franks hearing, as well as suppression of defendant's oral and written statements.

During the four evidentiary hearings on these motions, the court heard testimony from the following government witnesses: (a) Officer William Churilla ("Churilla"); (b) Officer Kevin Merkal ("Merkal"); (c) Officer David Lincoln ("Lincoln"); and (d) Officer William Kelsch ("Kelsch"), all of whom are employed by the Pittsburgh Police Department.  Defendant testified.

---

[2] The court denied as moot most of defendant's supplemental motion for discovery at the January 18, 2013 evidentiary hearing, (ECF No. 110 at 33), except to the extent that defendant still seeks the CI's phone number, which the court will address herein.

He called the following defense witnesses: (a) Ronald Getner ("Getner"), a private investigator hired to assist in his defense; (b) Kenneth Bush ("Bush"), an acquaintance of defendant whose cell phone was used to place several telephone calls to Wade on the day of the controlled buy; (c) William Smith ("Smith"), a friend of defendant who called Wade on the telephone on the day of the controlled buy; (d) Shaniqua Johnson ("Johnson"), who was a passenger in Wade's car when it was pulled over by the police; and (e) Douglas Sughrue ("Sughrue"), defendant's former defense attorney.

The parties submitted supplemental proposed findings of fact and conclusions of law on June 13, 2013, in which defendant raises two issues: (a) defendant's oral and written statements following his unlawful detention should be suppressed; and (b) defendant's motion for a <u>Franks</u> hearing should be granted. (ECF No. 123.) Upon consideration of the parties' submissions and the evidence and testimony presented at the evidentiary hearings, the court makes the following findings of fact and conclusions of law:

## I. <u>Findings of Fact</u>[3]

### A. The Controlled Buy and Search Warrant

1.      Information obtained from a CI was used in connection with the arrest of defendant. (Hr'g Tr. Sept. 20, 2011 ("September 2011 Transcript") (ECF No. 58) at 50.)

2.      On December 24, 2009, Churilla and other Pittsburgh police officers detained the CI for attempting to sell baby powder to police officers. (<u>Id.</u> at 52.) The CI attempted to pass off the baby powder as an illegal drug. (<u>Id.</u>) The CI agreed to provide information to police in exchange for their not filing charges against him for his attempted sale of sham drugs. (<u>Id.</u> at 52-53.) He told police he knew about a person selling drugs in the Lawrenceville neighborhood of

---

[3] Defendant indicates that he is not challenging the court's findings of fact as set forth in its previous memorandum opinion, (ECF No. 75), "except to the extent that those findings of fact are inconsistent with the telephone records that were admitted." (ECF No. 123 at 1 n.2.)

Pittsburgh, Pennsylvania. (Id. at 53.) The CI did not know the real name of the drug dealer in Lawrenceville. (Id. at 54.) He knew the man by the street name of "Spider." (Id.) The investigation led to Wade and his home at 3828 Penn Avenue in Lawrenceville ("Wade's residence" or the "residence"). (Id.) Police believed that defendant was selling drugs from his residence. (Id.)

3.       On January 27, 2010, at approximately 6:30 p.m., Churilla and Merkel met the CI in anticipation of arranging for the CI to buy crack cocaine from Wade. (Id. at 57, 90.) They searched the CI to ensure that he did not have any contraband or money. (Id.) The CI used his cell phone to call Wade. (Id. at 57-58.) The CI arranged to buy a "fifty piece" of crack cocaine in exchange for fifty dollars. (Id. at 59.) After the phone call, Merkel left to set up surveillance on Wade's residence. (Id. at 59-60.) When he arrived at approximately 6:45 p.m., he contacted Churilla to let him know that he was in position, with an unobstructed view of the residence. (Id. at 59-60, 132.) Before Churilla and the CI left the police station, the CI was searched again. (Id.) Churilla drove the CI to within walking distance of Wade's residence, and let him out of the car. (Id. at 60.) He gave the CI fifty dollars as he was leaving the car. (Id.)

4.       Churilla telephoned Merkel to inform him that the CI was on his way to Wade's residence. (Id. at 60, 132.) The officers remained on the phone with each other. (Id. at 133.) Churilla watched the CI walk toward the residence until Merkel could see the CI. (Id. at 60.) Merkel had binoculars, but did not need to use them because he was situated approximately twenty-five feet from the front door of Wade's residence. (Id. at 132.) The CI did not stop to talk to anyone. (Id. at 60.) The CI was within the sight of at least one of the officers from the moment he exited Churilla's car to the moment he arrived back to meet Churilla after the drug purchase. (Id. at 60, 133.)

5.      Merkel observed the CI arrive at Wade's residence at approximately 7:00 p.m.

(Id. at 132.)  Merkel did not observe any activity in or around Wade's residence during the

fifteen-minute interim between his arrival and the CI's arrival.  (Id.)  Merkel observed the CI

walk to the front door of the residence.  (Id. at 133.)  Merkel testified that he "believ[ed]" the CI

"made a phone call to let [Wade] know that he was there," but that he was "not sure what

happened or if [Wade] answered or not."[4]  (Id.)  The CI walked across the street and sat at a bus

stop facing the residence.  (Id. at 133-34.)  While the CI was sitting at the bus stop, Merkel could

not see whether he made any more phone calls because the CI was facing away from Merkel and

was wearing a hood.  (Id. at 134.)  Wade came out of the residence a few minutes later, and the

CI gave Wade fifty dollars.  (Id. at 133.)  Wade counted the money and handed the CI a small

quantity of crack cocaine.  (Id.)  The officers kept the CI under surveillance as he walked back to

meet Churilla.  (Id. at 135-36.)  The substance given to the CI by Wade tested positive as cocaine

on a field test kit.  (Id. at 136.)  Later that night, the officers completed an application for a

warrant to search Wade's residence for evidence of drug dealing.  (Id.)

6.      The next morning, on January 28, 2010, a warrant authorizing the search of

Wade's residence was signed.  (Id. at 69.)

7.      The search warrant described the premises to be searched as follows:

> The Premises of 3828 Penn Ave. Pittsburgh. Pa 16201. It is a 3
> story multi story family residence. The address in question is on
> the first floor, which leads directly onto Penn Ave. The front door
> is dark and has the address 3828 affixed to it. There is blue trim
> with 2 white windows to the right and left of the front door, and
> the mail box is black and fixed to the right of the front door. And
> All individuals at the execution of the search warrant.

(Jan. 28, 2010 Search Warrant (ECF No. 49-1) at 1.)

---

[4] The affidavit in support of the application for a search warrant described the first call made by the CI, but did not
state that the CI made a second call upon arriving at Wade's residence.  (Jan. 28, 2010 Search Warrant (ECF No. 49-
1) at 2-3.)

8.     The affidavit in support of the application for the search warrant contained the

following averments:

>On 01/27/2010 at 1830 hrs Officer Merkel and I (Officer
>Churilla) met with a confidential informant about an individual
>selling crack cocaine from 3828 Penn Ave Pittsburgh, Pa. 15201.
>The actor is known to the confidential informant as aka: "Spider".
>We showed the confidential informant a picture of the individual,
>who lives at the residence by the name of Thomas Wade . . . , who
>goes by the street name as "Spider".  When the confidential
>informant saw the picture he/she I.D. Thomas Wade as the
>individual who is selling the crack cocaine.  The confidential
>informant stated that he only sells fifty pieces ( $50.00 of crack
>cocaine).  Based on this information, the target of our investigation
>will be Thomas Wade.
>
>The confidential informant then called Mr. Wade by cell
>phone to the number of 412-583-9683, this number was given to
>the confidential informant by Thomas Wade.  The confidential
>informant stated to Wade that he was looking for a fifty piece and
>he was up".  Wade state to the confidential informant the "ya hit
>me up when you get here" . I (Officer Churilla) then searched the
>confidential informant for monies and contra band with negative
>results.  This search of the confidential informant was witnessed by
>Officer Merkel.
>
>Officer Merkel then left in an unmarked vehicle and went
>to the area of 3828 Penn Ave. to take up a fixed and secure
>location to observe the front door of the residence.
>
>Once in his fixed and secure location Officer Merkel
>contacted me by cell phone and stated that he was ready.  Officer
>Merkel used a pair of Cannon image stabilizer (15x50 IS UD 4.5
>degree) binoculars.  The confidential informant was then given
>fifty dollars of official serialized U.S. currency. . . .  This money
>was photo copied by myself (Officer Churilla) before we left Zone
>2 station.
>
>I then contacted Officer Merkel at 1855 hrs and stated to
>him that I was driving the confidential informant from the our [sic]
>secure location to the target area of 38 28 Penn Ave.  I then drove
>the confidential informant to the mid block of 39th St. (between
>Butler St. and Penn Ave).  The confidential informant the exited
>my unmarked vehicle at 1857 hrs and started to walk up 39th st. to

Penn Ave.  I watched the confidential informant walk up the street until Officer Merkel made visual contact with the confidential informant.  During this time the confidential informant never stopped to talk with any one.  When the confidential informant made his/her way to the corner of 39th and Penn, Officer Merkel saw Thomas Wade exit 3828 Penn Ave.  The area of 3828 Penn Ave. is illuminated by several street lights, giving Officer Merkel a clear view of 3828 Penn Ave. and Mr. Wade when he walked from his residence.  When Mr. Wade come from the residence, he was wearing brown sweat pants, a dark colored long sleeve tee-shirt, and had braids in his hair.  Mr. Wade then meet the confidential informant to the left side of the door of 3828 Penn Ave.  Officer Merkel then watched the confidential with his/her right hand give wade the U.S. Currency.  Mr. Wade then counted the money and then with his right hand gave the confidential informant the crack cocaine in his/her right hand.  Mr. Wade stated to the confidential informant" hit me up when you need more".  The confidential informant then walked back down to the 39th street, with Officer Merkel keeping visual contact with him until I (Officer Churilla) stated to Officer Merkel by cell phone that I had a visual contact of the informant.  The confidential informant then walked back to the mid block of 39th St. and got back into the unmarked vehicle.

Once back in the vehicle, the confidential informant gave me a ripped knotted baggie corner of crack cocaine.  I then drove back to the same secure location and searched the confidential informant for monies and contra band with negative results.  This second search was witnessed by Officer Merkel.  After finding nothing on the informant, he/she was released and we returned back to Zone two station.

I (Officer Churilla) then with latex gloves opened the ripped knotted baggie corner of crack cocaine, and placed it into a Scott's test kit.  When that small piece of crack cocaine was tested, it was positive( turned blue) for cocaine base.  Officer Merkel then placed the crack cocaine and the positive Scott's test kit in a evidence envelope and sent it to the property room as evidence. . . .

(Id. at 2-3.)

### B.  Phone Calls Received by Wade Prior to the Controlled Buy

9.     On January 27, 2010, between 6:30 p.m. (the approximate time Merkel and

Churilla first met the CI to arrange the controlled buy) and 7:00 p.m. (the approximate time of

the controlled buy), Wade received thirty-one inbound phone calls.  (Wade's Call Records, Defendant's Exhibit A ("Ex. A").)

10.     Bush testified that he knew Wade, and that one of the phone numbers associated with multiple of Wade's incoming calls during the relevant thirty-minute time period had belonged to him in January 2010.  (Hr'g Tr. Nov. 22, 2011 ("November 2011 Transcript") (ECF No. 66) at 49-50.)  Bush denied being the CI.  (Id. at 51.)  Bush did not recall placing any telephone calls to Wade in January 2010, but believed he may have dialed the number by accident.  (Id. at 56-57.)  He also remembered losing his phone for a few days in January 2010.  (Id. at 65.)   Nine of the thirty-one incoming phone calls during the relevant period are attributable to the phone number used by Bush.  (Ex. A.)

11.     Smith testified that one of the numbers on the call records belonged to him in January 2010, that he did not allow anyone else to use his phone, and that he was not the CI.  (November 2011 Transcript (ECF No. 66) at 69-71.)  Four of the thirty-one incoming calls during the relevant period are attributable to the phone number used by Smith.  (Ex. A.)

12.     Getner testified that he conducted an investigation of the remaining numbers and concluded that three of the numbers on defendant's call records for the relevant time period on January 27, 2010 were associated with landlines as opposed to cellular telephones.  (November 2011 Transcript (ECF No. 66) at 73, 75.)  Collectively, the three landline numbers account for nine of the thirty-one incoming calls made during the relevant time period.  (Ex. A.)

13.     Getner could not identify the owner of six of the relevant phone numbers, accounting for nine total incoming phone calls during the relevant time period.  (November 2011 Transcript (ECF No. 66) at 73-76; Ex. A.)  A person or persons made the following calls to Wade's phone number on January 27, 2010; the content of the calls remain unknown:

| From Number | Time | Answered? | Duration |
|---|---|---|---|
| (412) 584-9815 ("Caller A") | 6:35:32 p.m. | Yes | four seconds |
| (412) 425-2645 ("Caller B") | 6:36:12 p.m. | Yes | seventy seconds |
| (412) 812-5042 ("Caller C") | 6:37:35 p.m. | Yes | twenty-three seconds |
| (412) 377-7377 ("Caller D") | 6:39:19 p.m. | No[5] | five seconds |
| (412) 277-4364 ("Caller E") | 6:40:44 p.m. | Yes | nine seconds |
| Caller D | 6:45:07 p.m. | No | four seconds |
| Caller D | 6:46:14 p.m. | No | three seconds |
| (412) 583-6258 ("Caller F") | 6:51:30 p.m. | No | three seconds |
| Caller D | 6:51:53 p.m. | No | twenty seconds |

14.     Sughrue, who represented Wade during the September, November, and January 2012 motions hearings, testified that he ran into Churilla at city court after Sughrue was terminated as Wade's counsel. (Hr'g Tr. January 18, 2013 ("January 2013 Transcript") (ECF No. 110) at 5.)

15.     The city court, where the two met, was loud and busy. (Id. at 8.) During the meeting, Churilla stated that he was upset with Sughrue's handling of Wade's case, particularly Sughrue's attacks on Churilla's integrity. (Id. at 11.)

16.     The two also discussed the CI's phone number, and Sughrue came away from the conversation with the impression that Churilla possessed the number used by the CI to call Wade on January 27, 3010. (Id. at 6-7.) If true, Sughrue believed that the information would contradict statements made by a former Assistant United States Attorney to the court indicating that the

---

[5] According to Exhibit A, this call was not answered, but was forwarded to voicemail. (ECF No. 121 at 2.)

government does not possess the CI's phone number. (<u>Id.</u> at 7.) Sughrue acknowledged, however, that it may have been a miscommunication and Churilla may have meant that he still knew the identity of the CI. (<u>Id.</u> at 9.) Churilla testified that he told Sughrue that he did not have the CI's phone number, and even if he did, he would not give it to Sughrue unless required to do so by the court. (<u>Id.</u> at 13-15.) Churilla testified at the January 18, 2013 hearing that he does not possess currently the phone number used by the CI to contact Wade on January 27, 2010. (<u>Id.</u> at 13.) Churilla testified that he does not know if the phone number used by the CI to call Wade was the same phone number that Churilla once had stored in his cell phone. (<u>Id.</u> at 21.) Churilla does not know if the phone number that he had for the CI was for a landline or cell phone. (<u>Id.</u> at 17.)

### C. Detention of Wade and Execution of the Search Warrant

17. On the afternoon of January 28, 2010 (the same day the warrant was signed), the police executed the search warrant on Wade's residence. (September 2011 Transcript (ECF No. 58) at 69.)

18. Just before execution of the warrant, Lincoln was traveling in an unmarked police car when he observed Wade travelling in another car. (November 2011 Transcript (ECF No. 66) at 11.) Wade at that time was approximately two miles from his residence. (<u>Id.</u>) Although the car in which Wade was travelling belonged to him, he was not driving, but was sitting in the front passenger seat. (<u>Id.</u> at 10-11.) Knowing that other police officers were on their way to execute a search warrant at Wade's residence, Lincoln and his partner, Officer Martin ("Martin"), began to follow Wade's vehicle in their unmarked police car. (<u>Id.</u> at 11.) When it became apparent that Wade was heading toward the neighborhood in which he lived, Lincoln contacted Churilla. (<u>Id.</u> at 11-12.) Churilla told Lincoln to stop the vehicle and detain Wade

before they executed the search warrant.  (Id. at 12.)  Churilla believed that "based on [Wade's] propensity for violence . . . , it was for the safety of [Wade] and also for us that [Wade] be detained prior to the execution of the search warrant."  (September 2011 Transcript (ECF No. 58) at 69.)  Wade was detained for the purpose of keeping him away from the residence during the search.  (Id. at 100.)  Churilla was afraid Wade might arrive at the residence while officers were conducting the search.  (Id.)

19.     Lincoln and Martin activated the lights and siren on their unmarked vehicle. (November 2011 Transcript (ECF No. 66) at 11-12.)  The female driver of Wade's vehicle stopped the car on the side of Herron Avenue, between Bryn Mawr Road and Webster Avenue. (Id.)  The location is approximately 1.3 miles (driving distance) away from Wade's residence. (ECF No. 123-3 at 1.)

20.     At 3:36 p.m. (September 2011 Transcript (ECF No. 58) at 99, 154), Lincoln and Martin approached the vehicle and ordered the occupants to show their hands.  (November 2011 Transcript (ECF No. 66) at 12.)  The car had three occupants: (a) defendant in the front passenger seat; (b) a female driver; and (c) Johnson, who was sitting in the rear seat of the car. (Id. at 14.)  The officers ordered the driver to shut the car off.  (Id.)  They ordered defendant to exit the car.  (Id.)  Defendant was told to place his hands on the vehicle, whereupon one of the officers patted him down for weapons.  (Id.)

21.     Lincoln testified that defendant was allowed to stand on the sidewalk, without handcuffs, while the officers pretended to check his license for active warrants.  (Id. at 16.) Lincoln wanted to delay Wade and to keep him relaxed.  (Id. at 15-16.)  Wade, on the other hand, testified that he was ordered to his knees after he was searched, and that he was immediately cuffed with a plastic zip tie.  (September 2011 Transcript (ECF No. 58) at 143-47.)  Johnson

testified that defendant was handcuffed and walked to the rear of the car where he was searched. (Hr'g Tr. Jan. 9, 2012 ("January 2012 Transcript") (ECF No. 70) at 7-14.)

22.     Wade had no memory of the officers pretending to check for warrants and testified that he never asked why he was pulled over or held. (September 2011 Transcript (ECF No. 58) at 151-53.)

23.     Johnson was initially told to remain in the vehicle. (January 2012 Transcript (ECF No. 70) at 13-14.)

24.     Approximately five minutes later, (id. at 8), a female police officer arrived to search Johnson and the other female occupant of the car.  (November 2011 Transcript (ECF No. 66) at 16.)  Johnson was ordered out of the car; she was handcuffed and searched, and she could see that defendant was handcuffed at that point.[6]  (January 2012 Transcript (ECF No. 70) at 8, 14.)  She and the other female occupant were placed in a police car while Wade's car was searched, and were ultimately taken to a police station to be questioned.  (Id. at 9.) They were released from the police station after approximately two hours without being charged with any crimes.  (Id. at 18.)

25.     Meanwhile, at 3:51 p.m., after defendant had been detained on Herron Avenue, Churilla and other police officers executed the search warrant at Wade's residence.  (September 2011 Transcript (ECF No. 58) 97-98.)  After knocking and announcing, the officers waited approximately one minute before forcing their way into the residence.  (Id.)  Upon entry, they conducted a security sweep of the residence, which lasted approximately two minutes; during the initial sweep, police officers located two baggies of suspected marijuana in plain view on a

---

[6] Lincoln also testified that Johnson and the other woman were permitted to stand on the sidewalk while their belongings and the car were searched.  (November Transcript (ECF No. 66) at 16.)  The court, however, finds the weight of the evidence favors the finding that all three individuals were handcuffed during the traffic stop while police officers searched the vehicle.

dresser in a first floor bedroom.  (Id. at 72, 97.)  After finding the marijuana, Churilla radioed Lincoln, telling him to arrest Wade.  (Id. at 72-73.)  Lincoln arrested Wade, who was then transported to the police station by another police unit.  (November 2011 Transcript (ECF No. 66) at 19.)

26.     During the traffic stop, Wade was detained for between fifteen and twenty minutes.  (September 2011 Transcript (ECF No. 58) at 73, 98.)   Wade was not questioned and did not make any statements during that time.  (Id. at 72.)

27.     After radioing for Wade's arrest, Churilla and other officers continued the search of Wade's residence.  (Id. at 76.)   In the kitchen of the residence, officers found plastic sandwich bags from which the corners had been removed.  (Id.)  Drug dealers often use the corners of plastic sandwich bags to package and transport small quantities of illegal drugs.  (Id.)   Officers also found hidden stashes of cocaine, jewelry, and cash, as well as a digital scale, shotgun shells, and a sawed-off shotgun.  (Id. at 76-78.)  All these items were hidden in various places behind ceiling tiles.  (Id.)  One of the stashes contained a wallet with Wade's identification card inside it.  (Id. at 78.)  Officers did not recover the serialized bills used by the CI in the controlled buy. (Id. at 78.)

28.     After the search was completed, Churilla returned to the police station where defendant was detained.  (Id. at 79.)  Churilla and Lincoln took Wade into the back office.  (Id.) They offered Wade an opportunity to use the restroom or have some food or drink.  (Id.)  They gave Wade a soda.  (Id.)  They read Wade his Miranda rights, which he understood.  (Id.)  Wade signed a Miranda rights form, indicating that he understood his rights and was willing to speak to police without the presence of an attorney.  (Id.)  Wade admitted to selling crack cocaine from his residence.  (Id.)  He denied that the shotgun found at the residence belonged to him—he

stated that it belonged to another person, whom Wade had permitted to stay at the residence and to sell crack from the residence. (Id. at 80.) Wade provided a written statement and a taped statement, both of which detailed how he sold crack cocaine from the residence. (Id. at 81.) He admitted that his phone number was the same number used by the CI the day before to arrange the controlled buy. (Id.) The parties agree that defendant was advised of his Miranda rights on at least two occasions on January 28, 2010.[7] (ECF No. 121.) The first occasion was at approximately 4:10 p.m. when Wade executed a written Miranda waiver form in the presence of Officers Moreno and Kazmierczak. (Id.) The second occasion occurred at approximately 6:45 p.m., when Wade was orally advised of his Miranda rights by Churilla and Lincoln. (Id.)

## II.    Conclusions of Law

### A.  Motion for a Franks Hearing[8]

1.       Under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood by supplying the omitted information to the original affidavit, and subsequently determining if the affidavit with the added information contains sufficient probable cause. Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997).

2.       In order to obtain a Franks hearing, defendant must first make a "substantial

---

[7] The joint stipulation filed by the parties indicates that defendant was advised of his Miranda rights at least twice "[o]n January 27, 2010." (ECF No. 121.) Because Wade was arrested on January 28, 2010, however, the court will accept the 28th as the proper date.

[8] At the January 18, 2013 hearing, the court gave its preliminary assessment with respect to the Franks hearing issue and granted defense counsel a limited right to address the spoliation of evidence issue raised at the hearing. Because defendant did not raise that issue in his proposed findings of fact and conclusions of law, the court will not address that issue.

preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, and (b) the false statement is material to the finding of probable cause.  United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006).  If that showing is made, and a hearing is granted, defendant must prove by a preponderance of the evidence that: (a) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (b) such statements or omissions were material, or necessary, to the probable cause determination.  Id.

3.	To determine whether deficiencies in the affidavit are "material," the court must follow the following procedure:

> When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit."

Id. at 384 (quoting Sherwood, 113 F.3d at 400).  If probable cause still exists after the affidavit has been "corrected," then the deficiencies are not material.  Id.

4.	To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments.  Yusuf, 461 F.3d at 383 n.8 ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses."); United States v. Heilman, 377 F. App'x 157, 177 (3d Cir. 2010).  In Heilman, the Court of Appeals for the Third Circuit outlined that requirement:

> To obtain a Franks hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and

intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions. The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument. The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof. Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite *mens rea*, it is insufficient to prove the affiant acted with negligence or made an innocent mistake. If the challenger provides sufficient proof and obtains a <u>Franks</u> hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination. If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

<u>Id.</u> (citations omitted).

5.      Here, defendant argues that police manufactured nearly the entirety of the affidavit in support of the January 28, 2010 warrant to search Wade's residence. Defendant argues that police never obtained information from the CI relating to Wade's drug dealing, and that the police never conducted a controlled buy of crack cocaine using the CI.

6.      The alleged falsity, if proven, would be material. Excising all information about the CI and the controlled buy leaves only a brief summary of the law enforcement experience of Merkel and Churilla and the criminal history of defendant. That information would not be sufficient to establish probable cause for the issuance of a search warrant. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Grubbs</u>, 547 U.S. 90, 96 (2006) (quoting <u>Illinois v. Gates</u>,

462 U.S. 213, 238 (1983)).  Probable cause determinations require the magistrate judge to make a "practical, common-sense decision."  Gates, 462 U.S. at 238.

7.      Defendant did not, however, make a sufficient preliminary showing that the affidavit contained a false statement.  He is, therefore, not entitled to a Franks hearing, and the court must deny the motion. In its previous opinion, the court already considered and rejected several scenarios set forth by defendant that he alleged could justify a Franks hearing. (ECF No. 75 at 16-18.) The court will not readdress those arguments. With respect to new evidence and argument, defendant presented no evidence to contradict any of the averments made in the application for the warrant.  His attempt to eliminate the potential callers (and by process of elimination present testimony that no CI called defendant at the appropriate time) failed.

8.      Defendant's most recent attempts to identify the other callers were made *ex parte* and did not allow the government an opportunity to respond to the proffered allegations. To that end, the allegations will not be considered by the court. Defendant also argues that it is "unlikely" that the call from Bush's phone number came from the CI. (ECF No. 123 at 15.) In making this argument, defendant asks the court essentially to disregard the very real possibility that someone known to Bush (who turned out to be the CI) came into possession of Bush's phone and made the calls in question to Wade. This scenario is particularly compelling in light of Bush's testimony that he did not recall calling Wade during January 2010—even though his phone was used to call Wade several times on the night of January 27, 2010—and that he lost his phone during that time period. Defendant's arguments in this respect amount to nothing more than conclusory allegations which do not constitute a "substantial showing" that would warrant a Franks hearing. Yusuf, 461 F.3d at 383 n.8.

9.      Churilla's testimony at the January 18, 2013 evidentiary hearing also confirmed

that the government is not in possession of the CI's telephone number, thus defendant cannot rely upon a comparison between Wade's phone records and the number allegedly possessed by the government. Even if the number were available and did not match Wade's phone records, the evidence would not be conclusive because the CI could have used a different phone when contacting Wade on January 27, 2010.

10. The same conclusion defeats defendant's request for an in camera inspection of the case files to determine whether the CI's number can be found therein. As the court acknowledged at the hearing, even if a number were found in the file, and the number did not match any of the numbers during the relevant timeframe, the possibility exists that the CI used a different phone to contact Wade on the evening of the controlled buy. An in camera inspection would not aid defendant in meeting his burden, and that request will be denied.

11. With respect to defendant's argument that the record does not support a finding that a single person called once to arrange the buy with Wade and again in response to Wade's instruction to "hit me up when you get here," it is nothing more than speculation. Merkel testified that he believed the CI made that second phone call, but could not be sure. It is entirely possible that the CI could have knocked on Wade's front door, rang the doorbell, sent a text message, or Wade simply could have seen the CI through one of the windows on the front of the house.

12. None of this additional argument constitutes a substantial preliminary showing that the affidavit contained a false statement which was material to the finding of probable cause.

13. Because the burden is on defendant, and because Wade failed to present any evidence beyond speculation and conclusory allegations to show that any specific statement made in the affidavit was false, the court must deny the motion for a <u>Franks</u> hearing. Defendant

failed to meet this initial burden.

**B. The Initial Detention**

14.     Defendant contends that the stop of his car on January 28, 2010 was made without justification and that his subsequent detention was unlawful. Defendant contends that the statements he made while detained were the product of his unlawful detention and should, therefore, be suppressed. Defendant argues that the recent Supreme Court decision in <u>Bailey v. United States</u>, 133 S. Ct. 1031 (2013), constitutes supervening new law that renders the initial stop of Wade's car and his detention illegal.

15.     The government responds that even if the initial stop and detention was illegal under the Supreme Court ruling in <u>Bailey</u>, substantial intervening events removed the illegal taint of the initial stop.

16.     The court previously held that the stop of Wade's vehicle was justified pursuant to the rule established in <u>Michigan v. Summers</u>, 452 U.S. 692 (1981), and its progeny. (ECF No. 75 at 18-22.)  In <u>Summers</u>, the Supreme Court held that the temporary, pre-arrest detainment of a suspect during the execution of a warrant to search his home was a "seizure" under the Fourth Amendment, but that such a seizure was reasonable in order to detain the subject, prevent flight, avoid violence during the search, and to aid in the search, and it is a less intrusive infringement of rights than an arrest.  <u>Id.</u> at 695, 701-04.

17.     In <u>Bailey</u>, the Supreme Court explicitly limited the <u>Summers</u> rule by concluding that "[t]he categorical authority to detain incident to the execution of a search warrant must be limited to the <u>immediate vicinity</u> of the premises to be searched." <u>Bailey</u>, 133 S. Ct. at 1041 (emphasis added). In supporting its conclusion, the Court acknowledged that "[w]here officers arrest an individual away from his home . . . there is an additional level of intrusiveness. A public

detention, even if merely incident to a search, will resemble a full-fledged arrest." Id. The defendant in Bailey had left the premises to be searched (his home) and was detained approximately one mile away. Id. at 1036.

18.     Although defendant in the present case was returning to his home and not driving away, as was the case in Bailey, the government appears to concede that the strict "spatial constraint" imposed in that case is sufficient to render the initial fifteen-minute stop of Wade illegal. (ECF No. 124 at 15, 19) (acknowledging that "it is clear that Wade's detention approximately one-and-a-half miles from his home exceed[ed] the geographic boundary imagined by the Supreme Court. Thus, the government assumes for the sake of argument that, in light of *Bailey*, the traffic stop on Wade may have been an illegal seizure."). The stop in the present case, made approximately 1.3 miles from Wade's home, was farther away from the premises to be searched than the defendant in Bailey. The stop took place, therefore, "at a point beyond any reasonable understanding of the immediate vicinity of the premises in question." Bailey, 133 S. Ct. at 1042. The recent Supreme Court holding in Bailey represents an intervening change in controlling law and the court concludes that the initial stop of Wade was illegal. The question remains, however, whether the initial illegal detention of fifteen to twenty minutes warrants the suppression remedy.[9]

---

[9] Although the recent decision in Bailey may have rendered the initial detention of Wade illegal, the government argues in the alternative that Wade's confession should not be suppressed because the police had a good faith belief that the stop was legal. In Davis v. United States, 131 S. Ct. 2419 (2011), the Supreme Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Davis, 131 S. Ct. at 2423-24. Although the alleged violation in Davis was an illegal search, its rationale applies equally to the similar Fourth Amendment violation of a brief illegal detention. The Davis Court acknowledged that it has recognized a "good-faith exception" to the exclusionary rule, particularly in instances where officers do not "violate [the suspect's] Fourth Amendment rights deliberately, recklessly, or with gross negligence." Id. at 2428-29. At the time Wade was detained, the government points out that five of the seven courts of appeals to have addressed the question—including the Court of Appeals for the Second Circuit in Bailey—interpreted Summers as allowing officers to detain suspects away from the premises to be searched. See ECF No. 124 at 21 (citing, inter alia, United States v. Bailey, 652 F.3d 197, 206 (2d Cir. 2011). Although the Court of Appeals for the Third Circuit had not weighed in on the particular interpretation of the Summers rule utilized by the officers in this case, the vast majority of appellate courts had done so. This appellate precedent—including the binding decision in Summers—illustrates

### C. Fruit of the Poisonous Tree

19.     The government argues that even if the original stop and detention of Wade was illegal, significant intervening events erased the illegal taint and rendered Wade's subsequent statements voluntary. Defendant relies upon the holding of the Court of Appeals for the Fourth Circuit in <u>United States v. Watson</u>, 703 F.3d 684 (4th Cir. 2013), to argue that the intervening events in the present case are not sufficient to render Wade's statement admissible. The court previously concluded that, even if Wade's initial stop and detention were illegal, it would still be compelled to deny the motion to suppress because his confessions would not be the fruit of the poisonous tree. (ECF No. 75 at 22-24.)  Defendant's new arguments do not alter that conclusion.

20.     "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  <u>Segura v. United States</u>, 468 U.S. 796, 804 (1984).   The fruit of the poisonous tree doctrine does not permit exclusion of evidence "simply because 'it would not have come to light <u>but for</u> the illegal actions of the police.'"  <u>Segura</u>, 468 U.S. at 815 (emphasis added) (quoting <u>Wong Sun</u>, 371 U.S. at 487-88).   The proper test for exclusion of evidence is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963).

21.     In <u>Dunaway v. New York</u>, 442 U.S. 200, 218 (1979), the Supreme Court held that

---

how the officers acted in good faith when detaining Wade for both his safety and the safety of the officers effectuating the search warrant. It bears noting that the record is also devoid of any evidence of deliberate, reckless, or grossly negligent behavior of the detaining officers; instead, testimony at the hearings indicated that the officers' only motivation was safety in light of Wade's known propensity for violence. In light of these factors, the good faith exception as set forth in <u>Davis</u> arguably could preclude exclusion in the present case. The court, however, bases its denial of defendant's motion on other grounds as set forth herein.

a confession given by the defendant, after he was seized without probable cause in violation of the Fourth Amendment and taken to the police station for questioning in an attempt to uproot evidence, was inadmissible where no intervening event broke the connection between his illegal detention and his confession. A violation of Fourth Amendment rights may occur even when the defendant is mirandized following the illegal seizure. Brown v. Illinois, 422 U.S. 590, 603–04 (1975). A confession made following an illegal arrest is subject to the Wong Sun "fruit of the poisonous tree" analysis notwithstanding proper adherence to Miranda procedures by the police. Id. at 602–03. To be admitted, the statement must be "'sufficiently an act of free will to purge the primary taint.'" Id. at 602 (quoting Wong Sun, 371 U.S. at 486). The Miranda warnings are a factor to be taken into consideration when determining whether the confession was obtained through the exploitation of a Fourth Amendment violation. Id. at 603. The Miranda warnings are not the only factor to be considered; rather, "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." Id. at 603–04. The burden of showing admissibility rests on the prosecution. Id. at 604.

22. With respect to the "purpose and flagrancy of the official misconduct" prong of the Brown test, defendant argues that Churilla incorrectly informed Lincoln that there was a "body warrant" for Wade, and that he made the statement to effectuate the detention "so that the police could then attempt to obtain an incriminating statement." (ECF No. 123 at 11.) Defendant makes no attempt to support this statement, which is directly contradicted by the evidence of record. No attempt was made to question Wade until after the marijuana was found in his residence and he was taken to the police station. Churilla testified that the stop was effectuated based upon Wade's propensity for violence in an effort to maintain the safety of both Wade and

the officers executing the search warrant. (September 2011 Transcript (ECF No. 58) at 69.) The stop was only effectuated once it became apparent that the car containing Wade was proceeding in the direction of his home. Defendant's speculation in support of his argument is insufficient to show flagrant official misconduct.[10] This factor, therefore, weighs in favor of finding the statements admissible.

23.    With respect to the temporal proximity element, Wade argues that the defendant in Watson was detained for three hours, which he contends is the same amount of time that Wade was held at the police station in the present case. (ECF No. 123 at 12.) Defendant relies upon language in Watson acknowledging that "the very nature of [a] prolonged detention was inherently coercive." Watson, 703 F.3d at 697. The detention in the present case, however, is distinguishable from that in Watson because Wade was only detained illegally for only fifteen or twenty minutes before he was arrested based upon evidence obtained during the lawful search of his house.

24.    In Watson, the defendant (Watson) was present in a building that was under surveillance by police, but he was not observed engaging in any illegal activity. Id. at 697-98. Officers entered the building, encountered Watson, and ordered him to stay put while they obtained a search warrant. Id. Watson was "restrained . . . continuously for three hours in the same location . . . as part of an uninterrupted course of events, during which 'there was no intervening event of significance whatsoever.'" Id. This illegal detention occurred before officers secured a warrant and took his statement. Id. The court concluded that Watson had been illegally

---

[10] In his initial motion, defendant argued that the "ruse" employed by Lincoln may have been sufficient misconduct to render defendant's statements inadmissible. (ECF No. 94 at 22-27.) Defendant does not, however, raise this argument in his proposed findings of fact and conclusions of law. To the extent that defendant did not remember Lincoln using the alleged ruse, it cannot be concluded that the ruse overbore defendant's will and rendered his waiver of Miranda rights involuntary. See Miller v. Fenton, 769 F.2d 598, 607-08 (3d Cir. 1986) (police lie insufficient to overcome the defendant's will because the defendant did not have an emotional reaction to the lie).

seized in violation of the Fourth Amendment because the police lacked probable cause to detain him. Id. at 693-94. The court also concluded that the district court erred in not suppressing Watson's statements under the analysis set forth in Brown. Id. at 697-98. In rendering that determination, the court noted that the "'temporal proximity' factor weigh[ed] strongly in Watson's favor because he was not freed from the officers' custody at any point between his initial seizure and the time he made his incriminating statement." Id. at 697. The court also relied upon "the record fail[ing] to show that there were any 'intervening circumstances' attenuating the illegal arrest from Watson's statement." Id.

25.     Defendant mischaracterizes Watson by equating the lengthy illegal detention in that case with the legal detention in the present case. Wade's illegal detention was of limited duration—fifteen to twenty minutes—as distinguishable from the "continuous" three hours "in the same location" in Watson. Wade was lawfully arrested based upon probable cause because officers found contraband at his home pursuant to the valid search warrant. Unlike Watson, defendant was removed from the location where he was arrested and was taken to the police station where he was legally detained for approximately three hours following his arrest; which, to the extent it is relevant, is distinguishable from the three-hour illegal detention in Watson.

26.     Notably, the court in Watson did not rely upon the length of time that Watson was detained when engaging in the Brown analysis. The temporal proximity between the illegal arrest and Watson's statement was not broken by any intervening event, since the defendant "was not freed from . . . custody" between the illegal arrest and the statement. As discussed below, the intervening events during the lengthy cooling off period while Wade was legally detained served to remove the taint of the brief illegal detention—further distinguishing Watson, in which the court explicitly recognized that no intervening events occurred. Id. Because of the substantial

difference in factual situations, <u>Watson</u> is inapposite and that the period of legal detention in the present case actually weighs in favor of finding Wade's statements to be admissible.

27.     With respect to the <u>Miranda</u> rights element set forth in <u>Brown</u>, defendant emphasizes that Watson and Wade were both advised of their <u>Miranda</u> rights twice, yet the court in <u>Watson</u> found that the Watson's statements should have been suppressed. (ECF No. 123 at 12.) Defendant again misreads <u>Watson</u>, however, because that court considered that <u>Miranda</u> warnings were given, but determined that they were given while the defendant was being illegally detained and no intervening events occurred. <u>Watson</u>, 703 F.3d at 697. Although the court in <u>Watson</u> ultimately granted the defendant's suppression motion, the facts in <u>Watson</u> are quite different from the facts in this case and the giving of the <u>Miranda</u> warnings is still a factor that may be considered. <u>Brown</u>, 422 U.S. at 603.

28.     As noted, the facts of <u>Watson</u> are less favorable than those in the present case insofar as the <u>Miranda</u> warnings in that case were given during the illegal detention, not after a valid arrest. <u>See</u> <u>Watson</u>, 703 F.3d at 688 (first set of warnings given as soon as officers instructed defendant to "sit down," and second set given "[w]hen [a detective] returned to the building with the search warrant"). While it is true that <u>Miranda</u> rights are not a "'cure-all'" for admitting statements obtained as a result of an illegal seizure, <u>Brown</u>, 422 U.S. at 602, the fact that Wade was advised of his rights at least twice, including a written waiver, after he was lawfully arrested on the basis of probable cause, weighs in favor of finding that his statements are admissible.

29.     The significant intervening events in the present case further distinguish the facts of <u>Watson</u> and break the causal chain following Wade's illegal detention. As discussed above, there are substantial intervening events in the present case: the police executed a warrant at

defendant's residence, the police discovered an abundance of highly incriminating evidence relating to defendant's illegal activity, the police lawfully arrested defendant for possession of marijuana,[11] defendant was mirandized at least twice, defendant signed a waiver of his rights, and at least two hours elapsed, during which time defendant was transported to the police station, given an opportunity to use the restroom, and given something to drink. Only then did defendant make the inculpatory statements at issue in the present case.

30.     Taken together, the factors set forth in Brown favor admissibility of Wade's confessions made on January 28, 2010. The government introduced evidence showing that there was no ill purpose in the conduct of the police which might justify the harsh penalty of suppression.  There is no evidence to suggest that the police investigating this case used the detention as an impermissible means of uprooting evidence, as was the case in Dunaway. After there was probable cause to arrest defendant, the officers advised defendant of his Miranda rights at least twice, and significant other intervening events occurred between the brief illegal detention and defendant's confession. The chain of causation was therefore broken, and defendant's motion to suppress must be denied.

### D.     Voluntary Statements

31.     Defendant argues that his statements were not voluntarily given and as such are not admissible because the use of the "ruse" overbore his will.[12] A valid waiver of Miranda

---

[11] Defendant argues that the court in Watson "rejected the theory that the proceeds of the search warrant about which a defendant was unlawfully detained may serve as the intervening event that purges an unlawful detention of taint." (ECF No. 123 at 12.) This statement, however, fails to recognize that the defendant in Watson was not the subject of the original police investigation; instead, he was swept up in officers' attempt to secure the building where the subject of the investigation was seen. Watson, 703 F.3d at 687-88. Once Watson was detained, officers essentially waited to obtain the search warrant so that they could justify the detention in the first place. Defendant in the present case was only detained because officers already had conducted a controlled buy of drugs from him and possessed probable cause sufficient to obtain a valid search warrant for his home. Officers were not detaining defendant to search him for further evidence or to charge defendant with a different crime; instead, they briefly detained him to protect both defendant and the officers effectuating the search of his home.
[12] In defendant's motion he argues that the use of the ruse during the initial detention was illegal on the ground that

rights is required to be voluntary, knowing, and intelligent. <u>Miranda</u>, 384 U.S. at 444. Courts must consider the totality of the circumstances in determining whether the waiver and resulting statement is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

32.      Police misrepresentations "do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances." <u>United States v. Velasquez</u>, 885 F.2d 1076, 1088 (3d Cir. 1989). A defendant challenging the voluntariness of a confession must establish "the essential link between coercive activity [by the police], on the one hand, and a resulting confession by a defendant, on the other." <u>Colorado v. Connelly</u>, 479 U.S. 157, 165 (1986).

33.      Defendant cites several decisions indicating that, in certain circumstances, police misrepresentations can result in involuntary statements, particularly where the misrepresentations involve promises or assurances made to the suspect to coerce or deceive the suspect into making the statement. <u>See</u> <u>e.g.</u> <u>Hopkins v. Cockrell</u>, 325 F.3d 579, 584-85 (5th Cir. 2003). In <u>Hopkins</u>, however, the court found that portions of a confession may have been involuntary in a situation where the interviewing detective (who was an old friend of the suspect) assured the suspect that they were "friends," that the conversation was "confidential," and that it was just between the two of them. <u>Id.</u> at 584. At the time those assurances were made, the suspect had been subjected to "being in isolation for fifteen days, being interviewed eight previous times, [and] being interviewed a ninth time by someone [the suspect] considered a 'close friend.'" <u>Id.</u> Defendant's reliance upon <u>United States v. Lall</u>, 607 F.3d 1277, 1287 (11th Cir. 2010), and <u>United States v.</u>

---

it violated defendant's Fourth Amendment reasonable expectation of privacy. Because the court already determined that the initial arrest was illegal, that argument is moot. The court, for the same reasons, will not address defendant's argument that Churilla radioed Lincoln incorrect information in order to effectuate the initial stop of defendant. The court will, however, address defendant's argument that his statements were rendered involuntary as a result of the ruse.

Rogers, 906 F.2d 189, 191 (5th Cir. 1990), are equally unavailing insofar as both cases involved affirmative promises of non-prosecution made by officers, which undermined the voluntariness of the suspect's Miranda waivers. Defendant adduces no evidence of a promise that he would not be prosecuted or be charged with a lesser offense by cooperating.

34.     The situation in the present case falls far short of the decisions cited by defendant, as exemplified by the distinguishable facts in Hopkins. No promises were made, defendant was briefly illegally detained for fifteen to twenty minutes, and defendant was unable to even remember the alleged "ruse" when he testified at the suppression hearing. In light of this last fact, defendant is unable to establish the necessary causal connection between the ruse and his confession, which took place several hours later, after he was lawfully arrested and twice waived his Miranda rights. There is simply no connection between the alleged ruse and the confession, and no evidence adduced by defendant indicates that his will was overborne by Lincoln's statements. Defendant's confession will not be suppressed.

**III.    Order**

AND NOW, this 9th day of July, 2013, upon consideration of the parties' filings, the arguments made by counsel at the suppression hearings held on September 20, 2011, November 22, 2011, January 9, 2012, and January 18, 2013, and the testimony of witnesses and the evidence introduced at those hearings, IT IS HEREBY ORDERED that, in accordance with the findings of fact and conclusions of law filed herewith, defendant's supplemental motion to suppress (ECF No. 94), supplemental motion for discovery (ECF No. 95), and renewed motion for a Franks hearing are DENIED. It is FURTHER ORDERED that, to the extent defendant seeks an in camera inspection of the case file for the CI, that motion is DENIED.

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge
